CARROTHERS V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-143-CR

ANDRE A. CARROTHERS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Andre A. Carrothers appeals his conviction and life sentence for murder.  In two points, appellant complains that the evidence is legally and factually insufficient to establish that he intentionally or knowingly caused the victim’s death.  We affirm.

II.  Background Facts

Appellant was indicted for the stabbing death of Jayne Barber.  After the jury found appellant guilty of murder, the trial judge sentenced him to a life sentence in the Institutional Division of the Texas Department of Criminal Justice.

III.  Legal and Factual Sufficiency

In two points, appellant argues that the evidence is legally and factually insufficient to establish that he intentionally or knowingly caused Barber’s death.

A.  Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the 
judgment in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

B.  Applicable Law

Section 19.02 of the penal code provides, “A person commits [murder] if he . . . intentionally or knowingly causes the death of an individual.”  
Tex. Penal Code Ann.
 § 19.02(b)(1) (Vernon 2003).  Penal code section 6.03 defines the culpable mental states as follows
:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. 

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Id. § 
6.03 (Vernon 2003).

C.  Applicable Facts

At trial, Andrea Anderson, appellant’s friend, testified that on Friday, September 26, 2003, appellant called her and told her that he had been on a “binge,” so she took him some clean clothes at the South Oaks Inn.  The following Monday morning, at approximately 1:00 a.m., Anderson received a phone call from appellant’s mother telling her that appellant was in jail and needed a ride home.  After picking up appellant at the Fort Worth jail, Anderson took appellant to appellant’s mother’s apartment.  At approximately 10:00 a.m. that same morning, appellant’s mother called Anderson and asked her to come over because appellant had told her that he had found a dead body.  When Anderson arrived at the apartment, she told appellant that he needed to call the police, but appellant told her that he did not want to call the police because he was afraid the police would think that he was involved with the victim’s death. Appellant stated that he had gotten high with the victim all week and had driven her car in exchange for drugs.  Appellant said that he had found the victim in her apartment “three to four days prior,” but that he could not remember the exact date because he had been on drugs.  Appellant told Anderson that the victim’s throat was cut, that she was sitting in a chair, and that she was wrapped in blankets.  He stated that there was blood in the chair. Appellant stated that he touched the victim to see if she was alive or dead, and once he realized that she was dead, he turned the thermostat down in the apartment to preserve the body. 

Anderson testified that after hearing appellant’s story, she left appellant’s mother’s apartment to go home and get her car because she was with a friend, and when she returned to the apartment, appellant was getting into a police car.  Appellant’s mother got into Anderson’s car, and they followed the police car to Barber’s apartment.  When they arrived at Barber’s apartment, appellant got out of the police car and led the way to the back door of the apartment.  Anderson testified that appellant never attempted to use the front door. Anderson stated that the back sliding glass door was closed but unlocked.  She said that she could smell “rotten flesh” when the police officer went into the apartment.  Anderson testified that appellant’s mother told her that appellant had purchased a knife with his social security check.
(footnote: 2)  However, appellant stated that he left the knife in Barber’s car when it was impounded. Additionally, when Anderson asked appellant if he had anything to do with Barber’s death, appellant said “no,” and seemed “very sincere.”  Anderson stated that appellant never told her that he moved the body and that he did not see Barber’s face because it was wrapped in a blanket.

J.D. Hopper, a Fort Worth police officer, testified that on September 30, 2003, at approximately 2:35 p.m., he received an investigation dispatch call that someone knew where a dead body was located.  After arriving at appellant’s mother’s apartment, Officer Hopper drove appellant to the Peppertree Apartments after appellant stated that was where he saw the dead body.  Officer Hopper stated that appellant seemed “flat” and “normal.”  When they arrived at the Peppertree Apartments, appellant pointed out Barber’s apartment and took Officer Hopper to the back sliding glass door.  Officer Hopper testified that he saw flies on the back door and that this indicated that something had died.  Officer Jones, who had met Officer Hopper and appellant at the apartment, opened the back door and went inside the apartment.  Officer Hopper testified that he could smell the decaying body and that the door did not appear to have been forced open.  While Officer Jones was inside the apartment, Officer Hopper stayed outside with appellant and began to question him about the body.  Although Officer Hopper gave appellant his 
Miranda
(footnote: 3) 
rights before questioning him, Officer Hopper stated that appellant was not under arrest.

Appellant stated to Officer Hopper that he had known Barber for approximately four or five months and that she was a friend.  Appellant told Officer Hopper that Barber would let him borrow her car and he would bring her drugs in exchange for using the car.  Appellant also told Officer Hopper that he did not call the police because he was afraid.  Officer Hopper testified that appellant stated that he wrapped Barber in a blanket.

Sarah Waters, a homicide detective with the Fort Worth Police Department, testified that at approximately 2:30 p.m. on September 30, 2003, she received a dispatch call to the Peppertree Apartments.  She stated that when she arrived thirty minutes later, she noticed that appellant was jittery and nervous.  Appellant approached Detective Waters and told her that he had been on crack for the previous twelve days and that he had found his friend Barber four days earlier.  Appellant said that he has a psychological disorder, that he hears voices, and that he hallucinates.  After talking with appellant, Detective Waters then went inside the apartment and saw Barber lying on the floor in the living room.  She stated that Barber appeared to have been dead for a while because the decomposition was advanced and there were maggots on Barber’s face and clothing.  She noted that a TV, stereo, and VCR appeared to be missing from the entertainment center in the living room.  Detective Waters testified that she thought someone else lived in the apartment, so the police secured the apartment and left until a search warrant could be obtained.

Detective Waters stated that when she left Barber’s apartment, she went to the homicide office, wrote an arrest warrant for appellant for tampering with evidence, and interviewed appellant along with Detective Carroll.  She said that appellant seemed to be intelligent and not mentally ill or intoxicated.  Detective Waters stated that she took a written statement from appellant, which he signed at 8:30 p.m.  In the statement, appellant stated that he met Barber through his ex-girlfriend, Tricia Bryant.  Appellant said that he had Barber’s car the week of September 20.  Appellant stated that he did not call the police because he was too afraid to make an anonymous phone call.  Appellant told Detective Waters that Barber was “deathly afraid” of her ex-husband and that the ex-husband had just gotten out of prison.  However, Detective Waters later learned that Barber’s ex-husband was still in prison at the time of Barber’s death.  Detective Waters testified that she confronted appellant about the inconsistencies in his story because “things did not add up.”  During her investigation, Detective Waters found out that Rhonda Tealer, one of the prostitutes that had been staying with appellant, was in jail and interviewed her. 

On October 6, 2003, Detective Waters obtained a search warrant to look for Barber’s property, bloody clothing, and a knife, and she went to the South Oaks Inn, where Tealer told her that appellant had rented a room.  She stated that she found a pair of blue jean shorts that appeared to have blood on them in a dresser drawer.  Detective Waters also took bedding and another pair of blue jean shorts from the motel room. 

Detective Waters testified that after learning from Tealer that appellant had pawned some jewelry and a stereo at a Cash America Pawn, she went to the store and obtained a pawn ticket for a watch, rope chain, and a ring.  She also got the September 22, 2003 video surveillance tape from the store.  At trial, Detective Waters pointed out appellant on the tape carrying a stereo speaker and a turntable.  The store also had surveillance video of the parking lot, which showed that appellant was driving Barber’s car.  The pawn store manager told Detective Waters that he only agreed to pawn the jewelry and not the stereo.  Detective Waters further testified that she obtained two rings and a bracelet from Tealer.  After obtaining the jewelry, Detective Waters took it to Donna Snodgrass, Barber’s friend, who verified that the items belonged to Barber. 

Glenn Box testified that on September 15, 2003, he checked into the Super 7 Motel with Eloy Rubio.  He stated that on September 19, 2003, Tealer, whom he met at the motel, came by his motel room and had some drugs.  Tealer told Box that she had gotten the drugs from appellant.  On September 20, 2003, Box saw Tealer with a woman named Shea
(footnote: 4) and Shea asked him if he knew how to get rid of “merchandise.”  Box testified that he thought Shea was talking about stolen merchandise.  Shea told him that she had some jewelry, a toaster oven, and a stereo.  Box agreed to look at the merchandise and walked with Tealer and Shea to a blue station wagon driven by appellant. After looking at the merchandise, Box told them that the stereo and toaster oven were not things that he could sell.  Box testified that the blue station wagon was still parked in front of the motel on September 22.  Box testified that after appellant got kicked out of the Super 7 motel, appellant moved into the South Oaks Inn.  He stated that while he and appellant were standing out on the motel’s balcony, appellant showed him a knife and told him that he had gotten into a fight with a Mexican and stabbed him.  Box asked appellant if the Mexican was dead, and appellant stated that he was not sure because he left after the stabbing.

The next night, while Box and appellant were at Carter Park, appellant told Box that the Mexican had recognized his car and had gone “looking for him.”  Appellant stated that when he got to Barber’s house, she was tied up in a chair with her throat slit.  Box asked appellant if he had called the police or touched anything, and appellant said no.  Appellant stated that he figured the Mexican had retaliated against him and killed Barber.  Appellant did not want to be connected to Barber’s murder, so he asked Box what he should do.  Box stated that if appellant had nothing to do with the murder, then he should call the police.  However, appellant stated that he could not call the police because his fingerprints were around Barber’s apartment.  Appellant then asked Box how to get rid of a body, and Box told him that he was not going to have anything to do with that.  Appellant said that he wrapped Barber’s body in plastic and put it in the bathroom.  Box told appellant that the body was going to create an odor, and appellant replied that he turned the air conditioner down and put incense in the apartment.  While they were at the park, appellant got out of Box’s truck, and when he returned he told Box that he had gotten rid of the knife.  Box testified that he told appellant to get rid of the knife.

Bryant, appellant’s ex-girlfriend and Barber’s friend, testified that Barber was very protective of her property.  She said that Barber was paranoid and would lock the door immediately after letting someone in the apartment.  Bryant stated that she did not know Barber to loan out her car to anybody; however, she also stated that Barber might have loaned her car to appellant.  On September 19, 2003, she saw appellant at her apartment and he had a three-blade knife clipped to his belt.

Tealer testified that she met appellant on September 13 or 14 while she was walking down the street and that she became friends with him for his money.  She stated that on that same day, appellant bought her a knife at a convenience store because she was afraid of her husband, but she refused to carry it.  Tealer said that appellant was the only person to have the knife.  On September 19, 2003, appellant returned to the motel where they were staying with a car, watch, stereo, and a couple of rings.  Appellant told Tealer that he was renting the car from a friend, Barber, for crack and that Barber gave him the jewelry and stereo in exchange for drugs.  Tealer noticed that he had blood on him and the knife.  When Tealer questioned appellant about the blood, appellant told her that he had gotten in a fight with a “Spanish man.”  Tealer made appellant wash the blood off of the knife.

Tealer testified that she asked appellant if she could meet the lady that loaned him her car, but appellant very adamantly said no because “[Barber] wouldn’t understand.”  Tealer stated that between September 25 and September 29, appellant told her that he had found Barber dead in her apartment.  Appellant said that he found Barber dead on September 23, and that she was sitting in a rocking chair with her throat slit.  Tealer asked appellant if he had called the police, and he said no.  When Tealer asked him if he had killed Barber, he said, “[Barber] was my friend.”

Ricky Williams, Barber’s neighbor and an acquaintance of appellant through MHMR, testified that in September 2003, he had known appellant for approximately two to three months.  He stated that in September 2003 at approximately 7:00 to 8:00 p.m., appellant came over to his apartment with two stereo speakers and left them at his apartment.  Approximately ten to fifteen minutes later, appellant brought over the rest of the stereo, a toaster oven, a TV, and some other appliances, and then left again.  Williams testified that after bringing all the items over to his apartment, appellant started selling the items immediately.  He stated that appellant sold everything except for the TV, which he sold to Williams.  

Officer Harold Gass, a Fort Worth police officer in the crime scene unit, testified that in September 2003 at approximately 2:55 p.m., he responded to a call at Barber’s apartment.  Officer Gass testified that after entering the apartment through the sliding glass door in the back, he noticed that the front door was locked and dead bolted.  He further stated that the sliding glass door did not show any signs of forced entry.  He stated that when he looked at the thermostat, the air conditioner was on and the thermostat was set to fifty-five degrees, but that it was actually seventy-two degrees in the apartment.

Doctor Gary Sisler, a deputy medical examiner for Tarrant, Parker, and Denton counties, testified that on October 1, 2003, he performed the autopsy on Barber.  He stated that Barber’s body was in an advanced state of decomposition and estimated that she had been dead for more than thirty-six hours because of the extent of decomposition.  Dr. Sisler testified that he believed Barber knew that she was being attacked because she had defensive wounds on the back of her forearms.  Dr. Sisler said that the cut wound on Barber’s neck was five inches long and two and a half inches wide.  He listed Barber’s death as a “cut wound to the neck.”

Jody Hrabal, a forensic DNA analyst for Orchid Cell-Mark, testified that she received numerous items in this case to test for possible DNA.  She stated that she had been provided Barber’s DNA through hair roots, and appellant’s DNA through a buccal swab.
(footnote: 5)  Hrabal stated that she tested the back patio door handle of Barber’s apartment for DNA and found a large amount of Barber’s DNA and a small amount of appellant’s DNA on the door handle.  She said that she found Barber’s blood and DNA and appellant’s DNA on a pair of Bugle Boy blue jean shorts.

Max Courtney, the lab director and owner of Forensic Consultant Services, testified that the large amount of blood in the chair cushion indicates that Barber was facing the chair, but not seated in the chair, when her neck was cut.  Courtney opined that Barber was standing at or near the chair when her throat was cut.  He stated that Barber could not have gone over to the sliding glass door after her throat was cut without “leaving a trail of blood along the way,” which was not found in the apartment. 

In appellant’s written statement that he signed on September 30, 2003, he stated that he met Barber through Bryant, his ex-girlfriend.  He said that he became friends with Barber and that she let him use her car on four occasions.  The shortest time that appellant had Barber’s car was for two days.  Appellant always gave Barber some crack when he returned her car to her.  Appellant stated that he had Barber’s car the week of September 22 to September 27, and that Barber had told him to have her car back on September 27. Appellant went over to Barber’s apartment on September 27 at approximately 1:00 a.m. to return the car, but Barber did not answer the front door when he knocked. Appellant stated that it was “unusual” for Barber not to answer the door.  After knocking on the front door again with no answer, appellant walked around to the back sliding glass door.  He noticed that the door was partially open, so he went inside Barber’s apartment and called out her name.  When Barber did not answer, appellant went looking for her in the apartment and noticed a bunch of blankets on a chair in the living room.  When he looked closer, appellant saw arms sticking out of the blankets, so he moved Barber to the floor thinking that she might still be alive.  However, when he unwrapped her face, he saw that it was blue and that her throat was “all gored up,” so he took a blanket or sheet off of her bed and covered her up.  Appellant stated that he turned the thermostat down to sixty degrees to help preserve the body and then took Barber’s car back to the motel where he was staying.  He stated that he did not tell Tealer or Shea about discovering the body.  

The State and appellant’s attorney stipulated that if Judy Alarcon, Barber’s sister, would have testified, she would state that she recognized the stereo speaker, turntable, and jewelry as belonging to Barber.  Alarcon would have also testified that Barber was “not in the habit of loaning her car out to people.”  Additionally, the State and appellant’s attorney stipulated that if Snodgrass, Barber’s friend, would have testified, she would have said that the last time that she saw Barber was on September 20, 2003.  A couple of days later, Snodgrass noticed that Barber’s car was missing, but she did not think anything about it because Barber had stated that she had wanted to get out of town.  On September 26, 2003, Snodgrass saw the lights in Barber’s apartment turned on and saw something moving around inside the apartment, but she thought it was Barber.  Additionally, Snodgrass stated that Barber was “excessively protective” of her car and did not let anyone, besides her dad and niece, drive the car.  She stated that Barber was “very afraid of everyone and kept her apartment locked at all times.  She would never open the door to a stranger.”  Snodgrass stated that Barber never allowed anyone to pawn her things for her and that she would never have pawned her TV or stereo. 

D.  Analysis

Appellant complains that the evidence fails to show that he “intentionally or knowingly committed the murder.”  Specifically, appellant asserts that the State’s circumstantial evidence is “so weak that no rational trier of fact could conclude that the essential elements of the offense were proven beyond a reasonable doubt.”
(footnote: 6)  However, the surveillance tape shows appellant pawning Barber’s stereo on September 22, 2003, when he claimed to have noticed that her stereo was missing on September 27.  In his written statement, appellant asserts that he did not tell Tealer or Shea about finding Barber’s body, but Tealer testified that appellant had told her about the discovery one night. Additionally, when Detective Waters interviewed appellant, he did not mention that he had pawned Barber’s property; instead he merely stated that he had walked into Barber’s apartment, found her dead, and left the apartment.  Appellant had Barber’s car in his possession, but witnesses testified that Barber never lent her car to anyone except her father and niece.  Appellant told Tealer and Box that he had gotten into a fight with a Mexican and stabbed him; however, Detective Waters testified that she could not find any reports of cuttings or stabbings that occurred between September 16 and September 30 that met appellant’s description of the incident.  Tealer and Box both testified that appellant had blood on his shorts, and Tealer testified that appellant had blood on the knife.  Box stated that appellant inquired about how to dispose of a body and even suggested burning the building down so that he could not be traced to Barber’s apartment.  Appellant opined that the Mexican had retaliated against him by killing Barber, but everyone who knew Barber testified that she would not open her door to strangers.  Additionally, appellant’s blood was found in Barber’s apartment, and Barber’s blood was found on appellant’s blue jean shorts.  Finally, there was no evidence of forced entry into the apartment, and appellant took the police to the back door without first trying to open the front door.  

Unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury’s determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.  
Johnson v. State
, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000).  Here, the jurors were present when the testimony was given and the evidence was introduced.  After reviewing the record, we cannot say that a different result is appropriate and must defer to the jurors’ determination.  

We hold that the evidence, when viewed in the light most favorable to the verdict, supports a determination beyond a reasonable doubt that appellant intentionally or knowingly killed Barber; therefore, we overrule appellant’s first point.  Additionally, when viewed neutrally, the evidence is not so obviously weak or so greatly outweighed by contrary proof that it would not support the finding of guilty beyond a reasonable doubt.  We overrule appellant’s second point.  

IV.  Conclusion

Having overruled appellant’s two points, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: July 20, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Appellant was receiving social security checks because he was mentally ill and was receiving treatment from the Texas Department of Mental Health and Mental Retardation (MHMR).  

3:
See Miranda v. Arizona
, 396 U.S. 868, 90 S. Ct. 140 (1969).  

4:
Shea’s last name is unknown.

5:
A buccal swab is a swab from the inside of a person’s cheek.

6:
Appellant concedes that in certain instances, circumstantial evidence can be legally sufficient to prove an offense.